1  SARAH PREIS, DC BAR # 997387 (PHV *pending*)
   (Email: sarah.preis@cfpb.gov)
2  COLIN REARDON, NY Bar # 4945655 (PHV *pending*)
   (Email: colin.reardon@cfpb.gov)
3  BENJAMIN CLARK, IL BAR # 6316861 (PHV *pending*)
   (Email: benjamin.clark@cfpb.gov)
4  Consumer Financial Protection Bureau
   1700 G Street NW
5  Washington, DC 20552
   Phone: (202) 435-9318, -9668, -7871
6  Fax: (202) 435-7329

7  Attorneys for Plaintiff
   Consumer Financial Protection Bureau

8

9                 **UNITED STATES DISTRICT COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**

10

11  Consumer Financial Protection Bureau,

12              Plaintiff,                    Case No. 2:17-cv-4720

                v.                           **COMPLAINT FOR**
13                                           **PERMANENT**
    Commercial Credit Consultants (d.b.a. Accurise);   **INJUNCTION AND**
14  IMC Capital L.L.C. (a.k.a. Imperial Meridian   **OTHER RELIEF**
    Capital L.L.C., Imperial Capital, and IMCA
15  Capital L.L.C); Prime Credit, L.L.C. (a.k.a. Prime
    Marketing, L.L.C.; d.b.a. Prime Credit
16  Consultants); Blake Johnson; and Eric Schlegel,

17              Defendants.

18

19

20

**INTRODUCTION**

1.     Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), brings this action against Commercial Credit Consultants (d.b.a. Accurise); IMC Capital L.L.C. (a.k.a. Imperial Meridian Capital L.L.C., Imperial Capital, and IMCA Capital L.L.C); Prime Credit, L.L.C. (a.k.a. Prime Marketing, L.L.C.; d.b.a. Prime Credit Consultants); Blake Johnson; and Eric Schlegel (collectively, "Defendants") under Sections 1031(a), 1036(a), and 1054(a) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), and 5564(a), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and its implementing regulation, the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, to obtain permanent injunctive relief, civil money penalties, and other appropriate relief in connection with Defendants' offer and sale of credit repair services to consumers.

**JURISDICTION AND VENUE**

2.     This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

3.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District, under 28 U.S.C. § 1391(b)(2), because a

substantial part of the events or omissions giving rise to the claims herein occurred in this District, and under 12 U.S.C. § 5564(f), because Defendants are located in and do business in this District.

## PLAINTIFF

4.     The Bureau is an independent agency of the United States. 12 U.S.C. § 5491. The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564. The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the TSR as it applies to persons subject to the CFPA, 15 U.S.C. § 6105(d).

## DEFENDANTS

**Corporate Defendants**

5.     Commercial Credit Consultants (d.b.a. Accurise) ("CCC") is a Wyoming corporation with a principal place of business in Los Angeles, California.

6.     From August 1, 2009, until the summer of 2012, CCC offered or provided credit repair services to consumers.

7.     IMC Capital L.L.C. (a.k.a. Imperial Meridian Capital L.L.C., Imperial Capital, and IMCA Capital L.L.C) ("IMC") is a California corporation with a principal place of business in Los Angeles, California.

3

8.     IMC offered or provided credit repair services to consumers from approximately January 2012 until the summer of 2012.

9.     Prime Credit, L.L.C. (a.k.a. Prime Marketing, L.L.C.; d.b.a. Prime Credit Consultants) ("Prime") is a California corporation with a principal place of business in Los Angeles, California.

10.    From approximately July 2012 until September 30, 2014, Prime offered or provided credit repair services to consumers.

11.    In March 2013, Prime entered into an agreement with Park View Law, Inc. (a.k.a Park View Legal, a.k.a. Prime Law Experts, Inc.) ("PVL"), a California corporation that offered or provided credit repair services to consumers.

12.    Pursuant to the agreement between PVL and Prime, Prime handled marketing and performed credit repair services for consumers who entered into agreements with PVL.

13.    This agreement enabled Prime to offer credit repair services using PVL's name.

14.    CCC and Prime's assets were sold to a third party on October 1, 2014.

15.    CCC, IMC, and Prime each offered or provided credit repair, which is a consumer financial product or service covered by the CFPA, 12 U.S.C. § 5481(15)(A)(viii),(ix), and therefore are covered persons within the meaning of the CFPA, *id.* § 5481(6).

16.     CCC, IMC, and Prime were each a seller, as defined by the TSR, 16 C.F.R. § 310.2(dd), because, in connection with a telemarketing transaction, they provided, offered to provide, or arranged for others to provide goods or services to customers in exchange for consideration.

17.     CCC, IMC, and Prime were each a telemarketer, as defined by the TSR, 16 C.F.R. § 310.2(ff), because, in connection with telemarketing, they initiated or received telephone calls to or from customers.

18.     Between August 1, 2009 and September 30, 2014, Corporate Defendants charged approximately 71,000 consumers at least $31,000,000 in fees.

19.     Corporate Defendants returned a portion of these fees to consumers through either refunds or chargebacks, including at least $850,000 between January 2012 and September 2014.

**Individual Defendants**

20.     Blake Johnson ("Johnson") is a resident of Los Angeles, California.

21.     Johnson formed CCC in 2009, and was its majority owner.

22.     Johnson is the founder and chairman of IMC, and owns a majority interest in IMC.

23.     Johnson formed Prime in July 2012, and was its majority owner.

24.     Johnson engaged in the acts and practices of CCC, IMC, and Prime set forth in this Complaint.

25.     Because of his status as a director, officer, or employee charged with managerial responsibility for CCC, IMC, and Prime, and because of his status as the controlling shareholder of CCC, IMC, and Prime who materially participated in the conduct of those entities' affairs, Johnson was a "related person" deemed to be a "covered person" under the CFPA with respect to each of those entities.  12 U.S.C. § 5481(25)(B), (C)(i), (ii).

26.     Eric Schlegel ("Schlegel") is a resident of Laguna Niguel, California.

27.     Schlegel was the president of CCC and also a minority shareholder in CCC.

28.     Schlegel was the president of Prime and is a minority shareholder in Prime.

29.     Schlegel engaged in the acts and practices of CCC and Prime set forth in this Complaint.

30.     Because of his status as director, officer, or employee charged with managerial responsibility for CCC and Prime, and because of his status as a shareholder of CCC and Prime who materially participated in the conduct of those entities' affairs, Schlegel is a "related person" deemed to be a "covered person" under the CFPA with respect to each of those entities.  12 U.S.C. §§ 5481(25)(B), (C)(i), (ii).

31.     Johnson and Schlegel were each "sellers" within the meaning of the TSR because, in connection with a telemarketing transaction, they each provided, offered to provide, or arranged for others to provide services to customers in exchange for consideration.  16 C.F.R. § 310.2(dd).

## DEFENDANTS CHARGED UNLAWFUL ADVANCE FEES

32.     Defendants marketed credit repair services to consumers nationwide through telemarketing.

33.     Corporate Defendants' customers included individuals who were seeking to obtain a mortgage, loan, refinancing or other extension of credit when they first communicated with Defendants.

34.     Corporate Defendants requested and received payment for credit repair services represented to remove derogatory information from, or to improve, consumers' credit histories, credit records, or credit ratings.

35.     Corporate Defendants typically charged consumers three types of fees in the first six months of service: (1) an initial consultation fee; (2) a one-time set-up fee; and (3) monthly fees.

36.     During sales calls with consumers, Corporate Defendants represented that a consultation regarding the consumer's credit report was the first step in the credit repair process.

37.     Corporate Defendants charged an initial fee that was typically $59.95 for the consultation and for a copy of the consumer's credit report.

38.     During the consultation, an analyst purportedly reviewed and discussed the credit report with the consumer and identified how Corporate Defendants could help the consumer increase his or her credit score.

39.     If the consumer agreed to receive services beyond the consultation, Corporate Defendants charged the consumer a one-time set-up fee that was typically hundreds of dollars.

40.     Consumers sometimes paid the set-up fee in in multiple payments over the first two months of service.

41.     Beginning in the third month of service, Corporate Defendants charged monthly fees, which were typically $89.99 per month.

42.     During the service period, Corporate Defendants mailed dispute letters to the credit reporting agencies, challenging much of the negative information in the consumers' reports, even if that information was accurate and not obsolete.

43.     Corporate Defendants continued to charge monthly fees until consumers affirmatively cancelled their contracts.

44.     Corporate Defendants typically did not obtain credit reports or credit scores while customers received services or after consumers completed services to

1 determine whether negative items had been removed from consumers' credit

2 reports or whether consumers' credit scores had increased.

3       45.    Johnson and Schlegel developed the fee structure and contracts that

4 CCC and Prime used, and had final decision-making authority over the fees those

5 entities charged.

6       46.    Johnson also developed the fee structure and contracts that IMC used,

7 and had final decision-making authority over the fees that it charged.

8 ## DEFENDANTS MISREPRESENTED THE EFFICACY OF THEIR

9 ## SERVICES

10       47.    Defendants have misrepresented the efficacy of their services,

11 including their ability to remove negative items and to increase consumers' credit

12 scores.

13 **Removal of Negative Items**

14       48.    Defendants misrepresented their ability to remove negative items from

15 consumers' credit reports by failing to make clear the limited circumstances in

16 which they could do so.

17       49.    Pursuant to the FCRA, a consumer reporting agency typically may not

18 report negative items that are more than seven years old, or bankruptcies that are

19 more than ten years old.  15 U.S.C. § 1681c.

20

50.     A consumer reporting agency may continue reporting a disputed item unless after an investigation the disputed item is found to be inaccurate, incomplete, or cannot be verified. 15 U.S.C. § 1681i(a)(5)(A).

51.     Following a reinvestigation, consumer reporting agencies only have to remove inaccurate, incomplete, or unverifiable information from consumers' credit reports.  15 U.S.C. § 1681i(a)(1)(A),(5)(A).

52.     In numerous instances, Defendants' marketing created the net impression that their credit repair services would or likely would result in the removal of material negative entries on consumers' credit reports, regardless of whether the negative entries were inaccurate or obsolete.

53.     Defendants did not make clear in sales calls or in online marketing that consumer reporting agencies only have to remove negative items from consumers' credit reports in limited circumstances.

54.     Defendants lacked a reasonable basis for representing that they could remove negative items when they did not have information indicating that such items were inaccurate or obsolete.

55.     Because Defendants typically did not track whether negative items were removed from consumers' credit reports, they lacked a reasonable basis for representing without qualification that their services would or likely would result in the removal of negative items.

**Ability to Improve Consumers' Credit Scores**

56.     Defendants misrepresented, explicitly and implicitly, their ability to increase consumers' credit scores.

57.     In numerous instances, Corporate Defendants represented during sales calls that Defendants' credit repair services substantially raised their customers' credit scores, often stating that their customers' scores increased by an average of 100 or more points.

58.     Defendants lacked a reasonable basis for representing that their credit repair services substantially raised their customers' credit scores.

59.     Corporate Defendants typically did not obtain or review consumers' credit scores to determine whether their credit scores increased after using Defendants' credit repair services.

60.     Because Defendants did not actually measure the average credit score increase obtained by consumers who used their services, Corporate Defendants lacked a reasonable basis for their statement that they increased credit scores by an average of 100 or more points.

61.     Corporate Defendants' representations that their services increased credit scores by an average of over 100 or more points were also false.

62.     CCC and Prime's websites have also included alleged testimonials or descriptions of individual results.  Such testimonials or descriptions state that the

1  consumer's scores increased significantly or that certain negative items were

2  removed as a result of Defendants' services.

3      63.     Those testimonials implied that the results were typical of what

4  consumers would generally achieve when using Defendants' services.

5      64.     CCC and Prime lacked a reasonable basis for representing that those

6  testimonials reflected what consumers would generally achieve when using

7  Defendants' services.

8  **<u>DEFENDANTS MISREPRESENTED AND FAILED TO CLEARLY AND</u>**

9  **<u>CONSPICUOUSLY DISCLOSE THE TERMS OF THEIR "GUARANTEE"</u>**

10     65.     Defendants represented that they offered a money-back guarantee.

11     66.     Corporate Defendants' marketing created the impression that if a

12 consumer was not satisfied with their credit repair services, then the consumer

13 could obtain a refund.

14     67.     But Corporate Defendants' sales contracts typically limited the

15 guarantee to the removal of a minimum of one disputed item within 180 days of

16 the execution of the sales contract.

17     68.     Defendants construed the guarantee as meaning that so long as

18 Defendants' credit repair services resulted in the removal of a single disputed item

19 within six months, consumers could not obtain a refund, even if their credit scores

20 did not improve.

12

69.     Corporate Defendants also typically required customers to pay for a full six months of services to be eligible for the guarantee.

70.     Corporate Defendants did not clearly and conspicuously disclose the limitations of their refund policy during sales calls or in their online marketing.

71.     Corporate Defendants typically did not provide consumers with a copy of the sales contract until after the consumer had provided payment information for the initial consultation fee.

72.     Johnson and Schlegel were aware of complaints from customers who considered Corporate Defendants' marketing of the guarantee to be deceptive.

**DEFENDANTS MISREPRESENTED THE COST OF THEIR SERVICES**

73.     In addition to an initial consultation fee and a one-time set-up fee, Defendants charged customers who enrolled in credit repair services monthly fees.

74.     In numerous instances, Corporate Defendants failed to disclose to consumers during sales calls that they would be charged a monthly fee.

**COUNT I**

**Advance Fees in Violation of the TSR**

**(All Defendants)**

75.     The allegations in paragraphs 1-74 are incorporated by reference.

76.     It is an abusive act or practice under the TSR for a seller or telemarketer to request or collect fees for credit repair services until the seller has

provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

77.     Because Defendants were each telemarketers, sellers, or both, Defendants violated the TSR by requesting and collecting fees for credit repair services before providing consumers with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.  16 C.F.R. § 310.4(a)(2).

## COUNT II

## Misrepresentations about Material Aspects of the Efficacy of Their Services in Violation of the TSR

### (All Defendants)

78.     The allegations in paragraphs 1-74 are incorporated by reference.

79.     It is a deceptive act or practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the efficacy of their services. 16 C.F.R. § 310.3(a)(2)(iii).

80.     In numerous instances, in connection with the offering or provision of credit repair services, Defendants represented, directly or indirectly, expressly or

by implication, that their actions will or likely will result in the removal of material negative entries on consumers' credit reports regardless of whether the negative entries were inaccurate or obsolete.

81.     In numerous instances, in connection with the offering or provision of credit repair services, Defendants represented, directly or indirectly, expressly or by implication that their actions will or likely will result in a substantial increase to consumers' credit scores.

82.     These representations have been material and likely to mislead consumers acting reasonably under the circumstances.

83.     Because Defendants lacked a reasonable basis for these representations, the representations were deceptive.

84.     Defendants' representations were false.

85.     Because Defendants were each telemarketers, sellers, or both, Defendants' material misrepresentations about the efficacy of their services violated the TSR.  16 C.F.R. § 310.3(a)(2)(iii).

## COUNT III

### Failure to Disclose Limitations on Guarantee in Violation of the TSR

**(All Defendants)**

86.     The allegations in paragraphs 1-74 are incorporated by reference.

87.     It is a deceptive act or practice under the TSR for a seller or telemarketer to fail to clearly and conspicuously disclose material terms and conditions in an advertised refund policy before a consumer consents to pay. 16 C.F.R. § 310.3(a)(1)(iii).

88.     Defendants represented that their services came with a money-back guarantee.

89.     Defendants failed to clearly and conspicuously disclose the limitations that their contracts place on this guarantee before consumers consented to pay.

90.     Defendants misrepresented, directly or indirectly, expressly or by implication, the terms of this guarantee.

91.     Because Defendants were each telemarketers, sellers, or both, Defendants' failure to clearly and conspicuously disclose the material terms and conditions of their refund policy before a consumer consented to pay for goods or services violated the TSR.  16 C.F.R. § 310.3(a)(1)(iii).

## COUNT IV

### Misrepresentations Regarding the Cost of Services in Violation of the TSR

### (All Defendants)

92.     The allegations in paragraphs 1-74 are incorporated by reference.

93.     It is a deceptive act or practice under the TSR for a seller or telemarketer to misrepresent, directly or by implication, the total cost to purchase

the goods and services that are the subject of the sales offer.  16 C.F.R.

§ 310.3(a)(2)(i).

94.    Defendants have misrepresented the total cost of their credit repair

services.

95.    These representations have been material and likely to mislead

consumers acting reasonably under the circumstances.

96.    Because Defendants were each telemarketers, sellers, or both,

Defendants' misrepresentations about the total cost of the credit repair services

violate the TSR.  16 C.F.R. § 310.3(a)(2)(i).

## COUNT V

## Deceptive Acts or Practices in Violation of the CFPA

## (All Defendants)

97.    The allegations in paragraphs 1-74 are incorporated by reference.

98.    In numerous instances, in connection with the offering or provision of

credit repair services, Defendants represented, directly or indirectly, expressly or

by implication, that their actions will or likely will result in the removal of material

negative entries on consumers' credit reports regardless of whether the negative

entries were inaccurate or obsolete.

99.    In numerous instances, in connection with the offering or provision of

credit repair services, Defendants represented, directly or indirectly, expressly or

17

by implication that their actions will or likely will result in a substantial increase to consumers' credit scores.

100. These representations have been material and likely to mislead consumers acting reasonably under the circumstances.

101. Because Defendants lacked a reasonable basis for these representations, the representations were deceptive.

102. Defendants' representations regarding their ability to remove negative entries on consumers' credit reports and improve consumers' credit scores were false.

103. In numerous instances, in connection with the offering or provision of credit repair services, Defendants, directly or indirectly, expressly or by implication, made material misrepresentations regarding the terms of their guarantee.

104. Defendants' marketing has created the net impression that consumers could obtain a full refund if they were not satisfied with Defendants' services.

105. However, Defendants' guarantee policy was limited to the removal of one "disputed" item within 180 days, and only applied if consumers agreed to pay for six months of services.

106. In numerous instances, in connection with the offering or provision of credit repair services, Defendants, directly or indirectly, expressly or by

implication, made material misrepresentations regarding the costs of their credit repair services.

107.   These representations regarding the efficacy of Defendants' services, the terms of their guarantee, and the cost of their services have been material and likely to mislead consumers acting reasonably under the circumstances.

108.   Therefore, Defendants' representations as described herein have constituted deceptive acts or practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

## COUNT VI

### **Substantial Assistance in Violation of the CFPA**

### **(Johnson and Schlegel)**

109.   The allegations in paragraphs 1-74 are incorporated by reference.

110.   CCC, IMC, and Prime are covered persons that committed deceptive acts and practices in violation of the CFPA, 12 U.S.C. § 5536(a)(1).

111.   Johnson knowingly or recklessly provided substantial assistance to CCC, IMC, and Prime in their violations of the CFPA.

112.   Therefore, Johnson provided substantial assistance to CCC, IMC, and Prime, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

113.   Schlegel knowingly or recklessly provided substantial assistance to CCC, IMC, and Prime in their violations of the CFPA.

114.    Therefore, Schlegel provided substantial assistance to CCC, IMC, and Prime, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

## THIS COURT'S POWER TO GRANT RELIEF

115.    The CFPA empowers this Court to grant any appropriate legal or equitable relief including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment, and monetary relief, including but not limited to civil money penalties, to prevent and remedy any violation of any provision of law enforced by the Bureau. 12 U.S.C. §§ 5538(a); 5565(a), (c).

## PRAYER FOR RELIEF

The Bureau requests that the Court, as permitted by 12 U.S.C. § 5565:

a.    Permanently enjoin Defendants from committing further violations of the CFPA and the TSR and other provisions of Federal consumer financial law as defined by 12 U.S.C. § 5481(14);

b.    Grant additional injunctive relief as the Court may deem to be just and proper;

c.    Award damages and other monetary relief against Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA and the TSR, including but not limited to rescission or

1    reformation of contracts, the refund of monies paid, restitution, disgorgement or

2    compensation for unjust enrichment;

3           d.     Award Plaintiff civil money penalties; and

4           e.     Award Plaintiff the costs of bringing this action, as well as such other

5    and additional relief as the Court may determine to be just and proper.

6

7    Dated: June 27, 2017

8                                            Respectfully submitted,

9                                            Anthony Alexis
                                             Enforcement Director

10                                           Deborah Morris
11                                           Deputy Enforcement Director

12                                           Craig Cowie
                                             Assistant Litigation Deputy

13                                            /s/ Sarah Preis
14                                           Sarah Preis
                                             (Email: sarah.preis@cfpb.gov)
15                                           Colin Reardon
                                             (Email: colin.reardon@cfpb.gov)
16                                           Benjamin Clark
                                             (Email: benjamin.clark@cfpb.gov)
17                                           1700 G Street NW
                                             Washington, DC 20552
18                                           Phone: (202) 435-9318, -9668, -7871
                                             Fax: (202) 435-7722
19
                                             Attorneys for Plaintiff
20                                           Consumer Financial Protection
                                             Bureau